IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

BETTY NANNETTE MOSELEY,          )
                                 )
            Plaintiff,           )
                                 )
    v.                           )          CIVIL ACTION NO. 2:11CV812-SRW
                                 )
CAROLYN W. COLVIN, Acting        )
Commissioner of Social Security, )
                                 )
            Defendant.           )

## MEMORANDUM OF OPINION

Plaintiff Betty Nannette Moseley brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under the Social Security Act.  The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). (Doc. ## 9, 10). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

On June 10, 2008, plaintiff filed an application for disability insurance benefits, alleging disability since February 28, 2006 due to fibromyalgia, depression, anxiety, and problems with her eyes, back, neck, knee and hip.  (R. 200, 204; see also Exhibit 1D).  She reported work within the fifteen years preceding her alleged onset date as a convenience store

cashier and as a self-employed cleaner (R. 192, 204-05).  After plaintiff's claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing.  The ALJ rendered a decision on May 27, 2010 (R. 19-45), in which he concluded that plaintiff has severe impairments of borderline intellectual functioning, major depressive disorder, and anxiety.  (R. 21).  He concluded that she does not have an impairment or combination of impairments that meets or medically equals the listings (R. 24) and that, while she cannot perform her past relevant work (R. 39), she retains the residual functional capacity to perform other jobs that exist in significant numbers in the national economy, including the representative occupations of cafeteria attendant, poultry worker, and housekeeper cleaner (R. 40).  Thus, he concluded that she has not been under a disability, as defined in the Social Security Act, from her alleged onset date through the date of his decision.  (R. 41).[1]  On July 27, 2011, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ stands as the final decision of the Commissioner.  Plaintiff commenced the present action thereafter.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The court does not reweigh the evidence or substitute its judgment for that of the Commissioner.

---

[1]  The medical evidence of record is summarized in the appendix filed by plaintiff on March 22, 2013 (Doc. # 16).  Plaintiff accurately summarizes the medical evidence, with two minor changes: (1) for line # 12, plaintiff has written that plaintiff's cataracts will "[p]robably worsen until appt made for 8/31/07" but the doctor's note reads, "cataracts probably will worsen until removed surgically" and that "appt. was made ... for 8/31/07" (R. 265); and (2) at line # 30, plaintiff has combined the notes for two separate follow-up appointments under a single date (R. 433-34).

Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

### Plaintiff's Mental Impairments and Limitations

There are two consultative psychological examinations of record. The first was performed by psychologist Lee Stutts, Ph.D, on January 2, 2008, in connection with plaintiff's previous disability claim. (Exhibit 4F, R. 269-73).[2] Dr. Stutts assessed "Depressive Disorder, Not Otherwise Specified" and noted "No Diagnosis on Axis II."[3] (R. 270). Dr.

---

[2] Plaintiff's previous Title II claim was denied at the initial administrative level on January 22, 2008, four and a half months before she filed the present application. (R. 200-01).

[3] In the DSM's multiaxial evaluation format, Axis II is used primarily for personality disorders and mental retardation. See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 4th ed., text revision (2000)("DSM-IV-TR") at pp. 28-29.

Stutts observed that plaintiff's "level of intellectual functioning appeared to be in the low average to average range." (R. 273). He wrote, "Based on the findings of this evaluation, Ms. Moseley appears moderately to markedly impaired in her ability to understand, remember, and carry out instructions and to respond appropriately to supervision, co-workers, and work pressures in a work setting." (R. 273). On November 10, 2009, psychologist Marnie Dillon, Psy.D., evaluated the plaintiff. In addition to performing a mental status examination, Dr. Dillon administered both the WAIS-IV (Wechsler Adult Intelligence Scale) and WRAT-III (Wide Range Achievement Test). Plaintiff's WAIS IQ scores were 70 for verbal comprehension, 75 for perceptual reasoning, 80 for working memory, and 62 for processing speed, yielding a full scale IQ score of 67. (R. 412). Based on plaintiff's low WRAT scores (third grade level in reading, and fourth grade level in spelling and arithmetic), which were lower than predicted based on her IQ scores, Dr. Dillon assessed a reading disorder on Axis I. (R. 409, 413). She also assessed "Major Depressive Disorder, Severe Without Psychotic Features" on Axis I and, on Axis II, "Mild Mental Retardation." (R. 409). Dr. Dillon wrote, "Ms. Moseley is *moderately* impaired in her ability to understand, remember, and carry out simple repetitive tasks which require minimal judgment. She is *severely* impaired in her ability to understand, remember, and carry out complex instructions and in her ability to respond appropriately to supervision, co-workers, and work pressures in a work setting." (R. 413)(emphasis in original). Dr. Dillon also completed a medical source statement. Based on plaintiff's "severe depression[,] mild mental retardation[, and] learning disability[,]" she rated plaintiff's limitations as follows:

4

extreme as to making judgments on complex work-related decisions; marked as to understanding and carrying out complex instructions and making judgments on simple work-related decisions; and moderate as to understanding, remembering, and carrying out simple instructions. (R. 415). Noting that "depression results in some associated anxiety[,]" Dr. Dillon rated plaintiff's ability to respond to usual work situations and to changes in a routine setting to be marked. (R. 416). However, she rated plaintiff's limitations in interacting appropriately with supervisors, co-workers and the public as mild. (Id.).

Two non-examining medical sources also provided opinions regarding plaintiff's mental limitations. Psychiatrist Robert Estock, M.D., reviewed the record on September 4, 2008 and concluded that plaintiff has the medically determinable mental impairments of depressive disorder and anxiety. (Exhibit 9F, See R. 325, 327). Dr. Estock concluded, as to the four broad mental functional categories, that plaintiff has: moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace; a mild degree of limitation in activities of daily living, and that she had experienced no episodes of decompensation of extended duration. (R. 332).[4] Dr. Estock completed a mental residual functional capacity form in which he found plaintiff to have moderate limitations in nine of the twenty work-related mental activities and no significant limitation in the remaining activities; he also gave his opinion regarding plaintiff's mental residual functional capacity. (Exhibit 11F, R. 344-347). At the administrative hearing, non-examining psychologist Doug

---

[4] See 20 C.F.R. § 416.920a(c)(setting forth method for rating functional limitations caused by mental impairments).

McKeown, Ph.D., testified as an expert witness. (R. 68-74, 146-48). Based on his review of the record, including the consultative examination reports and the records from plaintiff's inpatient psychiatric treatment in November 2008, Dr. McKeown testified that the record indicated: no more than mild impairment in activities of daily living; moderate impairment in social functioning and in concentration, persistence, and pace; and one short-term episode of decompensation since 2006. (R. 68-70).[5] Dr. McKeown rated plaintiff's limitations as follows: "marked" as to completing complex tasks; "moderate" as to maintaining concentration, persistence or pace and as to tolerating work stresses; "mild-to-moderate" as to the ability to work with supervisors, co-workers and the general public; and "mild" as to completing simple tasks. (R. 70-71). Dr. McKeown testified that Dr. Dillon's RFC assessment "appears to be somewhat of an overstatement in some areas and not consistent with her verbal narrative or her narrative summary of the overall assessment." (R. 70). He expressed his opinion that plaintiff's work history suggests that she functions adaptively at a higher level than is reflected by her IQ scores, in the borderline intellectual functioning range; however, he did not believe plaintiff's intellectual functioning to be as high as estimated by Dr. Stutts. (R. 69). Dr. McKeown further testified that plaintiff "would be considered functionally illiterate." (R. 71). Plaintiff's records of outpatient mental health treatment were not then of record, and Dr. McKeown had not reviewed them. (R. 70, 72-73;

---

[5] The hearing transcript actually reads, "reportedly one short-term episode of decomposition work, like sitting, since 2006." (R. 70). As the Commissioner notes (see Doc. # 13, p. 7 n. 6), this appears to be an erroneous transcription. See 20 C.F.R. §416.920a(c)(3) and 20 C.F.R. Pt. 404, Subpt. P., ¶ 12.00(C)(4)(both referring to "episodes of decompensation," not "decomposition").

see Exhibit 22F (records of plaintiff's treatment at East Alabama Mental Health between November 2008 and January 2010, submitted by plaintiff's former attorney one month after the hearing)). However, on questioning by plaintiff's counsel, Dr. McKeown testified that it appeared from the hearing testimony that plaintiff had been treated essentially with medication and had not been hospitalized since 2008; he stated his opinion that, even if plaintiff also had a couple of visits with the counselor, such mental health treatment "would not establish ... more than moderate impairments." (R. 73).

Plaintiff was admitted to East Alabama Medical Center on October 18, 2008, when she "came in voluntarily to the hospital with suicidal ideation." (R. 350). The admitting psychiatrist initially assessed "Major Depression, not otherwise specified" on Axis I. While he deferred a diagnosis on Axis II, he estimated her IQ to be "low average range." (R. 353). Plaintiff "got steadily better" with medication intervention and group and individual therapy, and was discharged five days later, on October 23, 2008. (R. 350). On discharge, the discharging psychiatrist assessed "[m]ajor depressive disorder, probably recurrent, moderate in severity." (R. 351). On Axis II, the psychiatrist noted, "Deferred but none suspected." (Id.). The psychiatrist recommended that plaintiff follow up with East Alabama Mental Health (EAMH) for medication checks and therapeutic intervention. (Id.). On plaintiff's intake evaluation at EAMH on November 6, 2008, the psychologist assessed, on Axis I, "Major Depressive Disorder, recurrent, moderate" and "Cannabis Abuse." (R. 460). The psychologist deferred making an Axis II diagnosis. (Id.). The EAMH psychiatrist, Dr. Dan Guin, evaluated plaintiff six times between January 13, 2009 and January 26, 2010 and

prescribed medications. (Exhibit 22F, R. 440, 442-43, 447-53, 456-59). Plaintiff had one session with a staff therapist in March 2009, and two in January 2010. (R. 445-46,455).

As noted above, the ALJ concluded that plaintiff's severe impairments are borderline intellectual functioning, major depressive disorder, and anxiety. (R. 21). In his RFC finding, the ALJ concluded that plaintiff's mental limitations arising from these impairments are that:

> the claimant can understand and recall simple material but will show moderate impairment if asked to process the complex; the claimant can execute simple 1-3 step commands, but will show moderate impairment if asked to follow complex serial instructions; she can concentrate for two hour periods on simple, well known tasks and could assemble an[] eight hour day;[6] she will show irritable distractibility if asked to work in very close proximity to numerous others, but this effect will fade away with exposure; the claimant will miss a day of routine duties monthly, due to her psychological disorder; the claimant's contact with the general public should be limited to brief, superficial interaction; the claimant can respond adequately to direct, non-confrontational supervision; the claimant can adapt to simple, gradual well-explained workplace changes; [and] claimant can make adequate simple workplace decisions and plan reliably[.] ... The claimant is functionally illiterate (reads at approximately a 3d grade level), but is assessed to have Borderline Intellectual Functioning.

(R. 34-35).[7]

Plaintiff contends that these residual functional capacity findings are not supported

---

[6] This limitation actually reads, "she can concentrate for two hour periods on simple, well known tasks and could assemble *and* eight hour day[.]" (R. 34)(emphasis added). Plaintiff describes this limitation as "not intelligible." (Doc. # 12, p. 5). However, it is apparent that the last "and" is a typographical error and the phrase should be understood as "an eight hour day." See R. 347 (Dr. Estock's RFC opinion).

[7] As to plaintiff's allegations of physical pain, the ALJ further concluded that "the claimant will experience occasional bouts of mild to moderate pain which occasionally interfere with concentration, persistence and pace." (R. 35; see also R. 23-24, 38-39 (ALJ's discussion of plaintiff's physical complaints and treatment)).

by substantial evidence because the ALJ:  (1) rejected the mental retardation and severe major depressive disorder diagnoses of Dr. Marnie Dillon, the consultative psychologist who examined plaintiff in November 2010 and relied, instead, on the opinions expressed in 2008 by consultative psychologist Dr. Stutts and the non-examining state agency psychiatrist, Dr. Robert Estock, in connection with plaintiff's previous claim for benefits (Doc. # 12, pp. 6-7); (2) discounted Dr. Dillon's opinions as inconsistent with "absent treating records" (id.); (3) assessed mental limitations that are  "not vocationally quantifiable" (id., pp. 5-6);  and (4) failed to credit the testimony of medical expert psychologist Dr.McKeown that plaintiff had experienced "one or two" episodes of decompensation, instead concluding that she had suffered only one such episode (id., p. 7).

### The ALJ's Rejection of Dr. Dillon's Opinions

Resolution of the first two issues turns on whether the ALJ's reasons for rejecting Dr. Dillon's opinions are adequate and supported by the record.[8]  "Generally, the opinions of examining physicians are given more weight than non-examining physicians, and the opinions of treating physicians are given more weight than non-treating physicians." Timmons v. Commissioner of Social Security, 2013 WL 3388234, * 7 (11th Cir. Jul. 9, 2013). The Eleventh Circuit recently explained how the ALJ must evaluate medical opinions, as

---

[8]  Although plaintiff points out that the ALJ "revert[ed] to the opinions ... in a prior claim" rendered by Dr. Stutts and Dr. Estock (Doc. # 12, p. 6), the court understands plaintiff to contend that the ALJ erred by crediting these earlier opinions over that of Dr. Dillon, not that the ALJ erred by considering them at all in this subsequent claim.  Plaintiff's alleged onset date of February 28, 2006 predates Dr. Stutts' assessment by nearly two years, and Dr. Estock's by several more months. See SSR 96-6p (ALJ must consider findings of state agency medical and psychological consultants as to the nature and severity of a claimant's impairments).

follows:

> The ALJ must consider several factors in determining how much weight to give to each medical opinion, including: (1) whether the doctor has examined the claimant; (2) the length, nature, and extent of a treating doctor's relationship with the claimant; (3) the medical evidence and explanation supporting the doctor's opinion; (4) how consistent the doctor's "opinion is with the record as a whole"; and (5) the doctor's specialization. [20 C.F.R. § 404.1527(a)(2),] §§ 404.1527(c), 416.927(c). These factors apply to both examining and nonexamining doctors. Id. §§ 404.1527(e), 416.927(e). Upon considering medical opinions, the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor. Winschel [v. Commissioner of Social Security, 631 F.3d 1176, 1179 (11th Cir. 2011)].

> \*   \*   \*   \*   \*

> A treating physician's opinion must be given substantial or considerable weight unless "good cause" is shown to the contrary. Id.; see also 20 C.F.R. § 404.1527(c)(2) ("[g]enerally, we give more weight to opinions from your treating sources ..."). The ALJ does not have to defer to the opinion of a physician who conducted a single examination, and who was not a treating physician. See McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir.1987). In the end, the ALJ may reject the opinion of any physician if the evidence supports a contrary conclusion. Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir.1985).

Denomme v. Commissioner, Social Security Administration, 2013 WL 2097364, \*\*1-2 (11th Cir. May 16, 2013); see also Wainwright v. Commissioner of Social Security Administration, 2007 WL 708971 (11th Cir. Mar. 9, 2007)(unpublished opinion)(opinion of physician who examined plaintiff only once was "not entitled to any special weight"). The ALJ concluded that "Dr. Dillon's opinion is not consistent with the evidence of record, and, more specifically, her opinion is not consistent with the actual evidence of [plaintiff's] treatment." (R. 33).

As noted above, plaintiff contends that the ALJ erred by rejecting Dr. Dillon's

diagnoses of mental retardation and "severe" major depressive disorder and relying, instead, on the opinions of Dr. Stutts and Dr. Estock and, also, by rejecting Dr. Dillon's opinion in favor of "absent treating records."  (Doc. # 12, pp. 6-7).  On the latter point, plaintiff argues:

> The ALJ also rejected Dr. Dillon's opinion in favor of Plaintiff's treating records which he found more persuasive (R. 31).  Yet, the ALJ had previously complained about the lack of mental health and any treatment for a nearly two year period (R. 27).  The concept of finding absent treating records to be more persuasive than an examining clinician opinion does not help to rationalize the ALJ's findings.

(Id., p. 7).  The ALJ does, indeed, note that plaintiff received no professional mental health treatment between her alleged onset of disability and the consultative evaluation by Dr. Stutts nearly two years later.  (R. 27).  However, contrary to plaintiff's argument, the ALJ did not find these "absent treating records to be more persuasive" than Dr. Dillon's report.  The ALJ first notes Dr. Dillon's observations:

> As to her own observations, Dr. Dillon reported that the claimant appeared well-nourished and well-developed.  She was alert times four.  Her *behavior was cooperative*.  Her *speech was within normal limits for rate and flow*.  Her *affect was within normal limits for range and intensity*.  Her mood was reported to be depressed.  *Suicidal and homicidal ideation was denied. Thought associations were intact.  Thought content was logical.*  Her *recent and remote memories were intact.*  Her *insight, judgment and decision making abilities are moderately impaired.*

(R. 30)(citing R. 412, emphases ALJ's).  The ALJ continues:

> The claimant was diagnosed as suffering a major depressive disorder, severe without psychotic features; reading disorder; and mild mental retardation. (Id. [Dr. Dillon's report] at 1).  However, I note that Drs. Stutts and Estock found that the claimant's depressive disorder had indicated only moderate limitations, and, *perhaps more importantly, during emergency care the depressive disorder was thought to be moderate.  Furthermore, yearlong treatment at EAMH produced a diagnosis of major depressive disorder, moderate.  The*

> *continued treatment with EAMH, summarized above, indicates that her actual treatment there was for a diagnosis for a major depressive disorder, which was moderate.* I note that in accordance with agency guidance the treating physician/psychologist's opinion is generally entitled to greater weight than the opinion of an examiner. *In this case the claimant's treatment records are more persuasive and they discount Dr. Dillon's report.*

(R. 30)(emphases added).  It is clear from the ALJ's discussion that the treatment records he finds to be "more persuasive" are the actual records of plaintiff's inpatient treatment in 2008 and her subsequent outpatient treatment over a period of one year at EAMH, not "absent" treating records.  While he also cites the opinions of Dr. Stutts and Dr. Estock, he finds plaintiff's treatment records to be "perhaps more important[]." (R. 30).  The records the ALJ cites support his finding of a moderately limiting depressive disorder. Upon plaintiff's discharge from her five-day psychiatric hospitalization in October 2008, plaintiff's treating psychiatrist at East Alabama Medical Center assessed "[m]ajor depressive disorder, probably recurrent, *moderate in severity*." (R. 372)(emphasis added). The EAMH psychologist diagnosed "Major Depressive Disorder, recurrent, *moderate*" upon plaintiff's intake at EAMH for outpatient treatment in November 2008 (R. 460)(emphasis added), and there is no indication in plaintiff's treatment records that her EAMH psychiatrist modified this diagnosis during the course of her treatment.  (See Exhibit 22F, R. 438-60).  The EAMH records demonstrate that plaintiff's mental health treatment consisted primarily of medication, and that she saw a mental health counselor once in March 2009 (R. 455) and twice in January 2010 (R. 444-46). While plaintiff's EAMH treatment notes were not of record at the time of the hearing, Dr. McKeown testified that this level of treatment –

"essentially medication[,] ... no hospitalization since 2008[,]" and "a couple of visits with the counselor" – "would not establish ... more than moderate impairments." (R. 73).

The ALJ further observed that plaintiff's treatment notes at EAMH "do not suggest that the claimant suffered from a diminished intellectual ability" and that Dr. Stutts believed, upon his mental status evaluation of the plaintiff, that plaintiff was in the low average to average range of intelligence. (R. 30; see R. 273 and Exhibit 22F).[9] The ALJ's decision reflects that he also relied on Dr. McKeown's hearing testimony, the vocational expert's testimony, and plaintiff's own reports in rejecting Dr. Dillon's diagnoses. (R. 30-31). The vocational expert testified that plaintiff's work as an "animal caretaker" – training greyhounds for racing and working in a veterinary clinic – is semi-skilled work. (R. 76; see also R. 56-57 (plaintiff's testimony that she worked on a farm raising greyhounds for ten years and at a veterinary clinic for four years)). Dr. McKeown testified that plaintiff's adaptive functioning, as evidenced by her work history, is at a higher level than is suggested by her IQ scores – in the range of borderline intellectual functioning. (R. 69, 71). In concluding that plaintiff mental functioning is in the borderline range rather than the mental retardation range, the ALJ cited this testimony by Dr. McKeown and the vocational expert, as well as plaintiff's testimony that she has a driver's license, raised three children, and takes care of chickens. (R. 30; see also R. 51, 63 (plaintiff's testimony that she has a driver's

---

[9] EAMH deferred any diagnosis on Axis II. (R. 460). Upon her admission to the hospital in October 2008, the admitting psychiatrist deferred an Axis II diagnosis but estimated plaintiff's IQ to be in the "low average range." (R. 374). Plaintiff's discharge report indicates a deferred Axis II diagnosis but, also, that the discharging psychiatrist suspected no such impairment. (R. 372) ("Axis II: Deferred but none suspected.").

license and her hobbies include taking care of chickens, which she "can't hardly do" now); R. 271 (Dr. Stutts' January 2008 report regarding plaintiff's daily activities, stating that she "performs ADLs independently," "cooks and cleans without assistance," and "possesses a driver's license and is able to manage finances"); id. (noting that plaintiff has three children, then 19, 20 and 26 years old).  The  Eleventh Circuit has previously found a history of semi-skilled work to support an ALJ's conclusion that a claimant does not function within the mental retardation range, despite the existence of IQ scores in that range.  See Humphries v. Barnhart, 183 Fed. Appx. 887, 889 (11th Cir. 2006); Outlaw v. Barnhart, 197 Fed. Appx. 825 (11th Cir. 2006).  The ALJ's reasons for rejecting Dr. Dillon's opinions are both adequate and supported by substantial evidence of record.[10]

### *"Vocationally Quantifiable" Mental RFC Limitations*

Plaintiff contends that the ALJ's findings as to plaintiff's mental RFC limitations are "not vocationally quantifiable."  (Doc. # 12, pp. 5-6; see supra, p. 8).  The ALJ drew these findings primarily from the RFC opinion of Dr. Estock, the non-examining state agency psychiatrist (See Exhibit 11F at p. 4, R. 347).   The ALJ incorporated Dr. Estock's

---

[10]  Plaintiff argues that the ALJ's rejection of Dr. Dillon's opinions after he ordered the consultative examination "rais[es] the question of why the ALJ would obtain another evaluation at taxpayers' expense in the first place if only to reject it in favor of evidence he had previously found to be insufficient or requiring clarification pursuant to 20 CFR 404.1519a(b)(4) when a conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved, and we are unable to do so by recontacting your medical source."  (Doc. # 12, p. 6).  The consultative evaluation included administering WAIS and WRAT testing and there is no other such testing in the record.  While the ALJ did not find plaintiff to be as limited as suggested by her IQ scores, he found her to be functionally illiterate and adopted the WRAT reading assessment of a third grade reading level. (R. 34-35; R. 413).

conclusions by reference into his hypothetical question to the vocational expert, adding additional mental limitations.  (R. 76-77)("Mental limitations would be found at 11F page four.  And I would also assess that she's functionally illiterate, but otherwise would be considered borderline intellectual functioning due to adaptive functioning.  She has some pain complaints, so I will assess mild to moderate pain that occasionally interferes with her concentration, persistence, and pace.").  The vocational expert gave no indication that he was unable to interpret these limitations or apply them in the vocational context; he responded to the ALJ's hypothetical question without seeking clarification of these limitations.  (Id.).  Accordingly, the record does not support plaintiff's argument that the limitations are "not vocationally quantifiable" and the court finds this allegation of error to be without merit.

### One or Two Episodes of Decompensation

Plaintiff argues that, "[a]lthough he purported to assign great weight to the testimony of Dr. McKeown as 'worthy of belief' (R. 39), [the ALJ] rejected Dr. McKeown's assessment that Plaintiff had one or two episodes of decompensation since 2006 in favor of his own finding that there had been only one" such episode.  (Doc. # 12, p. 7).  The record includes an unsigned and undated medical source mental RFC form with "Dr. McKeown" written at the top of the first page.  (R. 425).  The section of the form labeled "Episodes of Decompensation Each of Extended Duration" includes four options for response: "None," "One or Two," "Three" and "Four or More."  (R. 426).  In the space labeled "None," there is a handwritten annotation of "1 or 2" – with the "1" circled – and "since 2006" written on the line below it. (Id.).  At the hearing, Dr. McKeown testified that the record indicated

"reportedly *one* short-term episode" of decompensation.  (R. 70 (emphasis added); see n. 5, *supra*).

The ALJ attributes the form to Dr. McKeown.  (R. 32).  However, the ALJ observes that there is no evidence of record that plaintiff "lost all or even some significant degree of her adaptive functioning for an extended two week period." (Id.).  He reasons that "[t]he lone incident that one might consider was her brief hospitalization in 2008," which does not demonstrate a loss of adaptive functioning for the required extended duration.  (Id.).  The ALJ assigned "great weight" to Dr. McKeown's testimony and assessment, "[w]ith the possible exception of his assessment regarding episodes of decompensation."  (R. 32-33).  The ALJ found that plaintiff had experienced "perhaps one episode of decompensation," noting that – aside from the one hospitalization – he "saw no further evidence that the claimant lost adaptive functioning ability." (R. 33).  Plaintiff identifies no evidence of record demonstrating a second episode of decompensation, and her argument is without merit.

### Plaintiff's Physical Impairments and  Limitations

Plaintiff argues that "[t]he ALJ found no physical impairments in his threshold severe impairment findings (R. 21) yet restricted Plaintiff from hazardous machinery and unprotected heights with an occasional ability to climb ladders, ropes and scaffolds, and avoidance of concentrated exposure to temperature extremes (R. 34), leading to a vocational profile of an individual who must avoid heights and temperature extremes but yet can climb ropes and scaffolds when weather conditions allow." (Doc. # 12, pp. 7-8).  Other than this single sentence, plaintiff presents no further argument on this issue. (Id.).  To the extent she

contends that the ALJ may not include physical restrictions in an RFC finding without also finding an independently "severe" physical impairment, her argument is without merit; RFC limitations may result from the combined effects of non-severe impairments. See 20 C.F.R. § 404.1545(a)(2)(assessment of RFC to must include consideration of effects of both severe and non-severe impairments). If plaintiff means to argue instead that the ALJ should have found an unspecified medically determinable physical impairment that would lead to these RFC restrictions to be "severe" at step two, the court notes that the ALJ's decision did not stop at step two of the sequential analysis. His finding of "severe" mental impairments required that he proceed – as he did – beyond the threshold severity determination. See 20 C.F.R. § 404.1520 (establishing sequential analysis). Thus, any error in this regard at step two is harmless.[11] See Delia v. Commissioner of Social Security, 433 Fed. Appx. 885, 887 (11th Cir. 2011)(ALJ's error in failing to find mental impairments to be "severe" at step two was harmless, where the ALJ found other severe impairments and considered the effects of the claimant's mental impairments at steps three through five); see also Burgin v. Commissioner of Social Security, 420 Fed. Appx. 901, 903 (11th Cir. 2011)(Where the ALJ found a severe impairment, "[e]ven assuming the ALJ erred when he concluded Burgin's edema, sleep apnea, and obesity were not severe impairments, that error was harmless because the ALJ considered all of his impairments in combination at later steps in the evaluation process."); Heatly v. Commissioner of Social Security, 382 Fed. Appx. 823,

---

[11] Aside from plaintiff's cataracts (discussed *infra*) and the cholelithiasis and cholecystitis resolved by gall bladder surgery in June 2009 (see Exhibit 14F), no medically determinable physical impairment diagnosed by an acceptable medical source is apparent from the record.

824-825 (11th Cir. 2010)("Even if the ALJ erred in not indicating whether chronic pain syndrome was a severe impairment, the error was harmless because the ALJ concluded that Heatly had a severe impairment: and that finding is all that step two requires. ... Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe.")(citations omitted).

Plaintiff further contends that the ALJ erred in his duty to develop the record by ordering a consultative examination to assess plaintiff's current vision.  (Doc. # 12, pp. 8-9).  In a consultative examination he performed on August 27, 2007, Dr. David Bazemore diagnosed plaintiff with cataracts in both eyes, which he indicated "probably will worsen until removed surgically."  (Exhibit 2F, p. 4).  He noted that she "does not meet criterion to renew driver's license."  (Id.).  Dr. Bazemore determined that plaintiff has "useful binocular vision in all directions" for both distance and near vision, and that her muscle function and visual field are normal.  (R. 264).  Dr. Bazemore assessed plaintiff's visual acuity, both without glasses and with best correction, to be 20/60 in the right eye and 20/40 in the left for distance, and 20/50 in the right eye and 20/40 in the left for reading or "Close Work."  (Id.).  Records from Callahan Eye Foundation demonstrate that plaintiff had surgery on her left eye on March 13, 2009 to remove the cataract and implant a lens.  (Exhibit 21F, R. 435-36).  One week after the operation, plaintiff's uncorrected visual acuity was 20/25 in the left eye.  (R. 433).  On April 15, 2009, one month after surgery, plaintiff's uncorrected visual acuity had improved to 20/20 in the left eye; the doctor noted that plaintiff was "[h]appy" with her

18

vision in that eye.[12]  (R. 434).  Plaintiff's physician reported an "excellent result" from the surgery.  (Id.).  Plaintiff's uncorrected visual acuity was 20/50 in her right eye; under glare conditions, it was assessed at 20/70.  (Id.). The doctor noted "Pt desires OTC readers" for her presbyopia.  (Id.).  Plaintiff was advised to return to the clinic for follow-up in six to nine months (id.), but there is no indication in the record that she did so.

Dr. James Anderson appeared as a medical expert witness at the administrative hearing held on February 8, 2010. (R. 47, 66-68).  He testified, based on Dr. Bazemore's consultative examination report (Exhibit 2F), that plaintiff had cataracts with "a best correctable of 20/50 in the right and 20/40 in the left."  (R. 67).  He added that "since this examination she's had at least one cataract repaired so it's presumed improved."  (R. 67).  However, he assessed her visual restriction to be as documented in the 2007 consultative examination, i.e., "20/50 and 20/40."  (Id.).[13]

The ALJ reasoned, as to plaintiff's visual limitations:

Although I advise[d] the claimant and representative that I would leave the hearing open for the provision of additional medical evidence – and I will consider the evidence provided pursuant to that guidance – I note that the medical expert was of course unable to assess her vision in conjunction with his recommended residual functional capacity statement.  He did mention her vision as depicted in the older evidence.  The claimant testified that she has a driver's license and drives when "*she must*" (emphasis added). She said she

_____

[12]  Plaintiff testified to the contrary at the administrative hearing held ten months thereafter, stating that – despite her eye surgery –  she "can see a little bit out of that eye, but not very well." (R. 52).

[13]  Dr. Anderson had not reviewed the medical records pertaining to plaintiff's cataract surgery, as plaintiff did not provide them to the ALJ until a month after the administrative hearing. (See Exhibit 21F, R. 432).  As he is required to do, the ALJ considered the evidence.  (R. 22).

> was not given glasses as she was told they would not help.  Based on the successful surgery and her reports that she continues to drive when "she must[,"] I find that at this point her visual limitations are slight abnormalities that may cause slight, if any limitation, in her ability to perform physical work activities.  Accordingly, I conclude that her visual limitations are nonsevere. I also note that I searched the evidence, and based on her pursuit of treatment there were no periods between the alleged onset date and this decision wherein the claimant's visual abilities caused her to be disabled in accordance with agency guidance of 12 months or more of disability.

(R. 22-23).  The ALJ did not include any visual limitations in his RFC finding.  (R. 34-35). Plaintiff contends that this was error because, "[e]ven if the ALJ was accurate in his interpretation of the ophthalmic records post surgery, there was still a three year period ... when Plaintiff would reasonably have had significant vision problems." (Doc. # 12, pp. 8-9). She also contends that, by failing to order another consultative eye examination, the ALJ failed in his duty to develop the record.  (Id.).

The medical evidence before the ALJ included both the August 2007 consultative examination report from Dr. Bazemore and the results of post-surgery evaluation by plaintiff's treating physician at Callahan Eye Foundation in March and April 2009, the latter evaluation occurring only ten months before the hearing.  (Exhibits 2F and 21F).  The record also includes evidence that plaintiff worked four to six hours per day as a "Cook/Waitress" from March 3, 2008 to March 31, 2008, without any special assistance or work conditions. (Exhibit 1E, R. 182, 183, 185; see also Exhibit 5D, R. 170).  The ALJ treats this job as an unsuccessful work attempt, but notes plaintiff's testimony that "[s]he was unable to sustain employment because of difficulty with lifting and carrying heavy items."  (R. 21).  Plaintiff gave no indication in her testimony that her visual impairment interfered with her

performance of this job.[14]

In a disability report completed on June 30, 2008 – roughly the mid-point between the August 2007 and the April 2009 evaluations and three months after plaintiff's failed work attempt – plaintiff indicated that someone else drives when she goes out because she cannot see well enough to drive (R. 217).  However, the report includes the query, "What were you able to do before your illnesses, injuries, or conditions that you can't do now?" (R. 215).

---

[14]  Plaintiff testified as follows:

Q       Have you worked anywhere since about February of 2006?

A       Yes, sir.  I've tried to go back to work after I was denied my disability the second time.  And I couldn't do it.  I only worked three weeks.

Q       Were you at a convenience store?

A       Yes, sir.

Q       Were you trying to be a cashier?

A       No.  I actually was a cook?

Q       Cook.

A       And served food.

Q       Okay.  What kind of problems did you run into there?

A       Lifting the[] heavy boxes of meat and the heavy boxes of potatoes and stuff like that, I couldn't do because of my neck and back.

Q       Okay.  So, you had to stop doing that?

A       Yes, sir.

(R. 53).

Plaintiff responded that she can no longer "stand for longer time, hold a job, sweep + mop floors, lift larger objects" or "drive (*at night*)[.]"  (Id.)(emphasis added).  She further indicated that she "watch[ed] T.V. everyday" but that it was "hard to see to read[.]" (R. 218-19).  She stated, "I use glasses [not prescribed] to try to read when I have to and have no help[.]" (R. 220).  Thus, by plaintiff's own report she was able – ten months after Dr. Bazemore's consultative examination – to drive (except at night) and to watch television; she also could read, when necessary, with the assistance of non-prescribed glasses.  (Exhibit 5E).[15]

Plaintiff argues that "the ALJ could have obtained a medical source opinion by consultative examination (CE) based on situations including an insufficiency in the record or a change in condition[,]" but she does not explain how the record is insufficient to permit a decision, or point to medical evidence of a deterioration in her vision after her most recent examination on April 15, 2009.  (Doc. # 12, p. 9).  Even if the ALJ erred by failing to seek another medical expert opinion, any such error does not require reversal in the absence of an "evidentiary gap" demonstrating unfairness or clear prejudice.  See Smith v. Comissioner of Social Security, 501 Fed. Appx. 875 (11th Cir. 2012)("[A] claimant must demonstrate that she was prejudiced by the ALJ's failure to develop the record before a due process violation will justify remand.  In making this determination, we are 'guided by whether the record reveals evidentiary gaps which result in unfairness or "clear prejudice."'")(citing Graham v.

---

[15] As noted above, plaintiff told her physician in April 2009 that she wanted over-the-counter readers for her presbyopia.  (R. 434).

Apfel, 129 F.3d 1420, 1423 (11th Cir.1997)).  In view of the evaluations by Dr. Bazemore and plaintiff's treating physician at Callahan Eye Foundation, as well as plaintiff's own reports of what she was able to do despite her visual impairments, the court finds no such unfair or prejudicial "evidentiary gap" here.[16]

To the extent plaintiff contends that the ALJ erred by failing to include any visual limitations at all in his residual functional capacity finding, the court agrees.  Dr. Anderson testified, based on his review of Dr. Bazemore's examination, that plaintiff's limitations included her visual acuity of "20/50 and 20/40." (R. 67).  While plaintiff's left eye impairment was surgically corrected, she had no such surgical correction of the right. Additionally, as plaintiff argues, her cataract surgery took place three years after her alleged onset date. (Doc. # 12, p. 9).  The Commissioner points out that: (1) even before her cataract surgery, plaintiff had 20/50 vision in the right eye and 20/40 in the left; (2) while the ALJ did not include these restrictions in his RFC finding, he included them in his hypothetical question to the vocational expert; (3) the vocational expert identified jobs that plaintiff could do even with these visual limitations; and (4) the ALJ relied on these jobs to find that

---

[16] Plaintiff also sought treatment from an ophthalmologist in October 2008, but she did not provide the record of this evaluation to the ALJ. The discharge report for plaintiff's psychiatric hospitalization in October 2008 indicates that she left the hospital on a "pass to visit her ophthalmologist[.]" (R. 350-51; see also Exhibit 8E (plaintiff's 10/16/08 disability report for appeal) at R. 230 (indicating an upcoming appointment on 10/21/2008 with Dr. Mark Tucker of "Eye Associates")). The ALJ had no obligation to obtain this evidence of post-filing-date medical treatment.  Smith, 501 Fed. Appx. at 878-79 (ALJ's duty to develop the record does not extend to the period after the claimant's filing date)(citing Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003)).

plaintiff is not disabled.  (Doc. # 13, p. 14).  Thus, the Commissioner contends, plaintiff has failed to demonstrate *reversible* error.  (Id.)(citing Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983)).  The court agrees. The ALJ's hypothetical question to the VE included Dr. Anderson's assessment of plaintiff's visual limitation, based on her eye impairments as documented in August 2007.  (R. 76 (hypothetical question including visual acuity of "20/50 on the right, 20/40 on the left"); R. 67 (Dr. Anderson's testimony)).[17]  The representative occupations identified by the vocational expert as within the limitations identified by the ALJ in his hypothetical question included: cafeteria attendant (DOT 311.677-010, 2400 jobs in Alabama and 176,000 nationally); poultry worker (DOT 525.687-066, 4300 jobs in Alabama and 121,000); and housekeeping/cleaner (DOT 323.687-014, 3800 jobs in Alabama and 285,000 nationally).  (R. 77).  The ALJ relied on this testimony in reaching his step five conclusion that "there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]"  (R. 40).  Thus, the ALJ's failure to include plaintiff's visual limitations in his RFC assessment does not deprive his step five finding of substantial evidentiary support.  His error, therefore, is harmless.[18]  See Timmons, 2013 WL 3388234

---

[17]  Plaintiff's visual acuity remained 20/50 in her right eye in April 2009.  (R. 434).  While Dr. Bazemore noted that cataracts are progressive and "probably" would worsen (R. 265), plaintiff has not produced medical evidence establishing that they did worsen, or that her vision deteriorated between the time of Dr. Bazemore's evaluation and the ALJ's decision.

[18]  Of the three representative jobs identified by the VE and relied upon by the ALJ, only one – cafeteria attendant – includes an occasional ("up to 1/3 of the time") requirement for near acuity, defined as "[c]larity of vision at 20 inches or less."  See Department of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993)("SCODICOT"), Appendix C; *Dictionary of Occupational Titles* (4th ed. 1991)("DOT"),

at *8 (finding the ALJ's omission of a squatting limitation from her RFC assessment to be harmless error because squatting is not required for jobs the ALJ found the claimant could perform)(citing applicable DOT provisions).

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is due to be affirmed.  A separate judgment will be entered.

DONE, this 5th day of September, 2013.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

§311.677-010.  As noted above, there is no evidence that plaintiff's visual limitation affected her job performance as a cook/waitress in March 2008 (see n. 14, *supra*), and plaintiff's treatment record for April 2009 indicated that she would use over-the-counter readers for her presbyopia (R. 434). The remaining two jobs include no requirement for near acuity, and none of the three identified jobs include a requirement for far acuity ("[c]larity of vision at 20 feet or more"), accommodation ("[a]djustment of lens of eye to bring an object into sharp focus"), depth perception, color vision, or field of vision.  SCODICOT, App. C; DOT §§ 311.677-010, 525.687-066, 323.687-014.